IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY DUCHARME, | No. C 10-02763 CRB |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| v. | |
| JOHN C. HEATH et al., | |
| Defendants. | |

In this putative class action, Plaintiff alleges two violations of the Credit Repair Organization Act ("CROA") and derivative violations of state law. Because one, but only one, of the Complaint's causes of action under CROA is valid, the Motion to Dismiss is GRANTED in part and DENIED in part.

**I.   BACKGROUND**

On February 9, 2009, Plaintiff Mary DuCharme retained Defendant Lexington Law Firm, a network of affiliated law firms that meets the definition of a credit repair organization under CROA, to do credit repair work on her behalf. Cmplt. ¶¶ 10, 14. Credit repair work generally consists of challenging various items on clients' credit reports. On Lexington's website, Plaintiff selected the "Concord Premier" plan, which costs $79.95 per month. Id. ¶¶ 15-16. She was then required to enter into a retainer agreement, which required her to (1) only contact credit bureaus through Lexington's written correspondence,

and (2) pay Lexington monthly fees. Id. ¶ 17.

Specifically, Lexington's retainer states: "In consideration of the Firm's legal services and low monthly fee, you agree . . . E. To only communicate with the credit bureaus through the Firm's written correspondence." Cmplt. Ex. A. The retainer also states, "The Firm does not charge you in advance for any legal services. It charges you the setup/first work fee only after that work has been accomplished. It then charges you for each month's work only after that work has been performed." Id. It explains that the client pays the $79.95 monthly fee "for work performed the previous month" and that the client "pay[s] only the fixed monthly fee identified in this agreement even though our attorneys' and paralegals' standard billing rates range from $50 to $250 per hour." Id. It reiterates that "The Firm's services are provided on a month-to-month basis. You are charged only for services rendered during the previous month." Id. And it adds, "If we fail to provide the agreed-upon services to you (as outlined by your selected service level) for any given month, you will not be billed for that month, or will be refunded your fees for that month if your payment has already been processed." Id.

Lexington notified Plaintiff that she would be charged a "first work fee" of $99.95 "after all work is done to get your first round of bureau disputes . . . out the door." Cmplt. ¶ 18. Plaintiff was also notified that Lexington clients are given access to an online credit library. Id. Plaintiff entered her credit card information and completed her online registration. Id. ¶ 19.

On February 14, 2009, Lexington drafted letters to credit reporting agencies, disputing items on Plaintiff's credit report. Id. ¶ 20. Lexington sent letters on Plaintiff's behalf on February 15 and 16, 2009. Id. ¶ 21. On February 20, 2009, Lexington deducted $99.95 from Plaintiff's credit card to satisfy the "first work fee." On March 20, 2009, Lexington deducted $79.99 from Plaintiff's credit card under the Concord Premier Plan. Id. ¶ 23. On April 20, 2009, Lexington sent challenge letters on Plaintiff's behalf. Id. ¶ 26. On April 20, 2009, Plaintiff paid her second payment of $79.95 under the Concord Premier Plan. Id. ¶ 27. And on April 30, 2009, Plaintiff closed her account.

Plaintiff alleges that Lexington violates CROA by (1) requiring clients to waive their right to contact credit bureaus directly, and (2) charging and receiving money for performance of a service before that service is fully performed. Id. ¶¶ 4-7. She seeks to certify two classes: (1) a Waiver Class, defined as "all persons nationwide who had contracts with Lexington Law for credit repair services that contained a provision requiring that the customer/client, in consideration for Lexington Law's services, agrees to only communicate with credit bureaus through Lexington Law's written correspondence"; and (2) a Monthly Charges Class, defined as "all persons nationwide who had contracts with Lexington Law for credit repair services that contained a provision requiring that the customer/client, in consideration for Lexington Law's services, agrees to pay Lexington Law on a monthly basis." Id. ¶¶ 30(a)-30(b). A Motion for Class Certification is on the Court's calendar for April 2011. Now pending is Lexington's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6).

## II.     ANALYSIS

### A.     Legal Standard

A motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the claims alleged in a complaint. Ileto v. Glock, Inc., 349 F.3d 1191, 1199-2000 (9th Cir. 2003). Under Federal Rule of Civil Procedure 8(a), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "Detailed factual allegations" are not required, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007)). According to the Supreme Court, "a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949-50. In determining facial plausibility, whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

//

### B.     CROA Cause of Action as to Waiver of Rights

Plaintiff alleges that Lexington violates CROA by including in its retainer agreement a provision requiring clients to "only communicate with the credit bureaus through the Firm's written correspondence." Cmplt. ¶ 6.[1]  Indeed, this is a violation of CROA.

CROA contains a provision entitled "Disclosure required," which requires credit repair organizations to provide consumers with a specific written statement before such an organization may enter into a contract with a consumer. See 15 U.S.C. § 1679c(a). That statement includes the sentence, "You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly." Id.  A separate subsection of CROA provides that "Any attempt by any person to obtain a waiver from any consumer of any . . . right of the consumer under this subchapter shall be treated as a violation of this subchapter." 15 U.S.C. § 1679f(b).

Lexington argues that section 1679c(a) "requires only that credit repair organizations disclose to clients prior to entering into a written agreement that the client may choose to contact the credit bureaus themselves," Mot. at 7-- something Lexington clearly does by including the required sentence on a subsequent page of its retainer, see Cmplt. Ex A.[2] However, the Ninth Circuit has held that section 1679c(a) does more than require disclosure, but in fact creates unwaivable rights. In Greenwood v. Compucredit Corp., 615 F.3d 1204, 1209 (9th Cir. 2010), the defendants argued that the "right to sue" language included in CROA's Disclosures section did not actually create a right to sue. The court rejected that argument, explaining that under such reasoning, "Congress, whose purpose in enacting the statute included protecting customers from misfortune . . . drafted a statute which required credit repair organizations to misinform consumers about a fictional right." Id.  The court went on to hold that the plain language of the "extremely broad anti-waiver provision in the

---

[1] Defense counsel confirmed at the motion hearing that Lexington clients may not contact credit bureaus on their own.

[2] This sentence makes little sense in Lexington's retainer, as it appears to directly contradict the earlier sentence in the retainer requiring clients to only communicate with credit bureaus through the Firm.

4

CROA protects the enumerated 'right to sue'" because "we read the term 'any right of the consumer' to apply to all rights in the statute," and because of "Congress's consistent use of the word "'right.'" Id. at 1210. Similarly, here, the "right to dispute inaccurate information in one's credit report by contacting the credit bureau directly" is an enumerated "right of the consumer" in CROA, and any attempt to obtain a waiver of that right is a violation of section 1679f(b).

Lexington's additional arguments to the contrary are unavailing.

Lexington argues that Plaintiff's reading makes no sense, because "nothing in the statute prohibits clients from then agreeing that the law firm may 'contact the credit bureau directly' on the clients' behalf," and points to the next sentence in the Disclosures section, which contemplates that a credit repair organization might be the point of contact with the credit bureaus. Mot. at 8. Of course, nothing in CROA prevents clients from employing credit repair organizations to contact credit bureaus on their behalf. That is not the issue. The issue is whether a client can waive his or her right to contact credit bureaus directly; Greenwood says no. In addition, the notion, central to Lexington's objection, that credit bureaus contacting credit bureaus on their clients' behalf constitutes "direct" contact between clients and credit bureaus, defies the plain meaning of the word "directly." It also makes one wonder how Lexington would define "indirect" contact between the client and the credit bureaus.

Finally, Lexington argues that allowing a client and his or her credit repair organization to both contact credit bureaus would "create confusion and inefficiency." Mot. at 8. This is by no means obvious; allowing clients to have contact with credit bureaus might enhance both accuracy and efficiency because not all information would have to be routed through an intermediary. See Opp. at 10. More importantly, however, Congress presumably "weighed the risks and benefits associated with providing customers the right to contact the credit bureaus directly and decided that the right to direct contact should not be abridged." Id. Indeed, Congress enacted CROA to protect clients from unfair business practices by credit repair organizations. 15 U.S.C. § 1679(b)(2). Allowing clients direct contact with

5

credit bureaus, even when those clients have hired a credit repair organization, is consistent with that purpose.

Accordingly, Plaintiff has succeeded in stating a claim under CROA based on Lexington's requirement that clients waive their right to contact credit bureaus directly. The Motion to Dismiss this cause of action is therefore denied.

### C. CROA Cause of Action as to Advance Payments

On the other hand, Plaintiff also alleges that Lexington violates CROA by "charging for services on a monthly basis," which it further characterizes as Lexington's being paid "for services that have only been partially performed." Cmplt. ¶ 8. The Court finds that this allegation does not state a claim under CROA.

CROA provides that "No credit repair organization may charge or receive any money or other valuable consideration for the performance of <u>any service</u> which the credit repair organization has agreed to perform for any consumer <u>before such service is fully performed</u>." 15 U.S.C. § 1679b(b) (emphasis added).

Plaintiff does not allege that Lexington's "first work fee" violates the Act, because that fee was "tied to the performance of specific services," <u>see</u> Cmplt. ¶ 50; <u>see also</u> Opp. at 2-3. Plaintiff alleges only that the monthly fee is improper because it is tied to "a period of time, as opposed to the services actually to be performed." Cmplt. ¶ 50. By way of illustration, Plaintiff explains that "[o]n March 20, 2009, Lexington Law deducted $79.95 from Plaintiff's credit card for work done challenging certain items, including items from ABC Collections. . . . This was prior to Lexington Law's full performance" because on April 20, 2009, Lexington Law sent a challenge letter to ABC Collections. Cmplt. ¶ 49. "Hence, Lexington Law received money in March 2009 for services challenging certain items that had only been partially performed." <u>Id.</u> Importantly, Plaintiff does not dispute the representation in Lexington's retainer that it only bills clients "for each month's work only after that work has been performed." <u>See</u> Cmplt. Ex. A. The cause of action seems based, instead, on Plaintiff's interpretations of the words "service" and "fully performed." <u>See</u> Opp. at 10-13.

6

Plaintiff would presumably define "service" as something big, like "challenging a client's credit with a certain credit bureau," whereas Lexington would likely define "service" as something smaller, such as drafting a letter or placing a telephone call.  The former, as Lexington argues, can take eight to twelve months, see Mot. at 10 (arguing that it would be impractical to only be paid after performing a year's worth of work), while the latter can be fully performed in an hour's time.  The Court notes that the word "service" is not defined in the Act.  But neither does the Act limit the word "service" to big-ticket items.  The Act speaks of "any service," see 15 U.S.C. § 1679b(b), and any service, in the Court's judgment, includes services big and small.  See U.S. v. Daas, 198 F.3d 1167, 1174 (9th Cir. 1999) ("If the statute uses a term which it does not define, the court gives that term its ordinary meaning.").

Plaintiff argues that another section of the Act, Section 1679d(b)(2), supports a contrary interpretation.  Opp. at 12.  That section requires that all credit repair contracts contain "a full and detailed description of the services to be performed by the credit repair organization for the consumer, including . . . (B) an estimate of– (i) the date by which the performance of the services . . . will be complete."  Plaintiff argued at the motion hearing that the word "service" in that section suggests something more substantial, like "challenging a client's credit with a certain credit bureau," because it would be impractical for a contract to set out time estimates for each telephone call.  But there is no reason a contract could not identify both overarching tasks to be performed, as well as smaller, component parts.

Moreover, Plaintiff's argument is undermined by her concession that the "first work fee" is permissible because it is "tied to specific services."  See Opp. at 13.  The "first work fee" is paid after Lexington has gotten a client's "first round of bureau disputes . . . out the door."  See Cmplt. ¶ 18.  But a "first round" of bureau disputes is not synonymous with a final resolution of a client's credit problem.  If it is permissible for Lexington to break a big-ticket item (e.g., "challenging a client's credit with a certain credit bureau") into smaller, component parts, then the Court is hard pressed to see what is wrong with defining those "specific services" as a month's worth of work, as opposed to a first (or second, or third)

7

round of disputes. Cf. In re National Credit Management Group, LLC, 21 F. Supp. 2d 424 (D. N.J. 1998) ("if all [defendant] does . . . is offer educational and credit material to consumers, there is no reason why a customer could not be charged each time the customer called up to order particular material"). Again, there is no allegation in this case that Lexington is charging clients for work it has not performed, only that the work, because it is ongoing, has not been "fully performed" at the end of each month.

But Plaintiff's definition of full performance also defies the plain meaning of the Act. In the Court's view, CROA's ban on advance payments for work that has not been fully performed cannot mean that credit bureaus are not to be paid until <u>all</u> work on a client's behalf is completed. This is because (1) the Act speaks of "any service" and "such service," not of "all services," see 15 U.S.C. § 1679b(b), and (2) determining when all work on a client's behalf has been "fully performed" is untenable. Are all services fully performed only if a disputed item is successfully removed from a client's credit report?[3] What if an organization challenges an item only to learn that the item was legitimate and should remain on the client's credit report? Are all services fully performed when responses from credit bureaus have been received? What if correspondence continues at length? What if a creditor or credit bureau does not respond? Worse yet, what if the credit repair organization determines that an issue has been resolved, bills a client for that work, and subsequently receives a communication from a creditor as to that issue? If it performs any work in response to that communication, using Plaintiff's definition, the earlier work must have only been partially performed, and the bill was therefore a violation of section 1679b(b). Instead, if "service" is defined as a typical legal task, such as drafting a letter (or a month's worth of letters), then that service can be indisputably fully performed upon the completion of the letter (or the month's worth of letters).

//
//

---

[3] If this was indeed Congress's intent in drafting CROA, nothing prevented Congress from declaring that credit repair organizations could only be paid on a contingent basis.

8

The Court recognizes that there is language in <u>FTC v. Gill</u>, 265 F.3d 944 (9th Cir. 2001), which suggests a different reading of the Act.[4]  In that case, the defendant credit repair organization received down payments of 25% to 50% of the estimated costs of the services before performing any work, and then billed clients on a regular basis whether or not the work was complete.  <u>Id.</u> at 951.  The defendant in <u>Gill</u> did not deny that he accepted down payments, and the court therefore held that he had violated the CROA by accepting payment before fully performing the services.  <u>Id.</u> at 956.  Though the Ninth Circuit phrased section 1679b(b)'s prohibition as "acceptance of <u>any</u> payment before <u>fully performing all services</u>," <u>id.</u> (emphasis added), the court gave no explanation for its deviation from the language in the Act (which, again, refers to "any service" and "such service," <u>see</u> 15 U.S.C. § 1679b(b)).  That case also quite clearly turned on the down payments, and not the monthly fees.  <u>See</u> <u>FTC v. Gill</u>, 71 F. Supp. 2d 1030, 1044-45 (C.D. Cal. 1999) (in district court, defendant defined the services he provided as analyzing credit reports, making telephone calls, drafting letters, etc., and not simply "'removing' negative items from consumers' credit reports" but court decided not to reach the issue, as the down payments were a clear violation of CROA).  <u>Gill</u> therefore does not apply to a monthly fee-only case such as this.

In sum, the Court finds that section 1679b(b) means what it says: credit repair organizations may not charge clients for any service until such service has been done.  By billing clients on a monthly basis for legal tasks that were indisputably performed during the previous month, Lexington does not run afoul of section 1679b(b)'s prohibition on advanced payments.  Accordingly, the Court grants the Motion to Dismiss as to this cause of action.

**D.   California Business and Professions Code § 17200 Cause of Action and Unjust Enrichment Cause of Action**

Finally, the Court agrees with the parties that the section 17200 and Unjust Enrichment causes of action are derivative of the CROA causes of action, and rise and fall

---

[4] There is very little case law involving section 1679b(b), and the typical case is far less ambiguous than the circumstances presented here.  <u>See, e.g.,</u> Rannis v. Fair Credit Lawyers, Inc., 489 F. Supp. 2d 1110, 1117 (C.D. Cal. 2007) ("Defendant does not present any evidence contradicting the fact that the actual amount paid was consideration for the services that Defendant later performed"); <u>FTC v. RCA Credit Services, LLC</u>, 2010 WL 2927688 at *9 (M.D. Fla. 2010) ("Defendants admit they collected money from consumers 'in advance of . . . [defendants'] purchase of . . . trade lines").

9

with them.  See Mot. at 12-14; Opp. at 14-15.  Because one of the two CROA causes of action survives the Motion to Dismiss, the two state causes of action also survive, and the Motion to Dismiss is denied as to them..

### III.    CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part the Motion to Dismiss.

**IT IS SO ORDERED.**



Dated: December 16, 2010

CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

G:\CRBALL\2010\2763\order re MTD.wpd                  10